**RECORD NO. 17-3046**

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals
## For The District of Columbia Circuit

# UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

**v.**

# DUSTIN XAVIER WILKINS,
# also known as Dxavier Wilkins, also known as Xavier Wilkins, also known as Chosen Wilkins,

*Defendant – Appellant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

_____

## BRIEF OF APPELLANT – PUBLIC COPY
## SEALED MATERIAL DELETED

_____

Gregory S. Smith
LAW OFFICES OF GREGORY S. SMITH
913 East Capitol Street, S.E.
Washington, D.C. 20003
(202) 460-3381

*Counsel for Appellant*

THE LEX GROUP<sup>DC</sup> ♦ 1825 K Street, N.W. ♦ Suite 103 ♦ Washington, D.C. 20006
(202) 955-0001 ♦ (800) 856-4419 ♦ Fax: (202) 955-0022 ♦ www.thelexgroup.com

## Certificate as to Parties, Rulings and Related Cases

(A) The parties to this case are Dustin Xavier Wilkins, Appellant, and the United States of America, Appellee.

(B) This is an appeal from a final judgment, issued by U.S. District Judge John D. Bates on June 6, 2017, denying a petition filed under 28 U.S.C. § 2255, seeking post-judgment relief from Wilkins' conviction and sentence. Judge Bates issued a Certificate of Appealability on July 5, 2017, authorizing Wilkins to pursue this appeal.

(C) There are no related cases pending on appeal. Wilkins' previous case in this Court, Appeal No. 15-3058, was voluntarily dismissed.


*/s/ Gregory S. Smith*
Gregory S. Smith
Counsel for Appellant

i

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iv

STATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION ....................................................... 1

STATEMENT OF ISSUES ..................................................................... 1

STATEMENT OF THE CASE .................................................................. 1

    A.    Procedural Background ................................................................ 1

    B.    Summary of Wilkins' § 2255 Proceedings ........................................ 5

            1.    Testimony of Petitioner Wilkins and Documentary
                 Exhibits .................................................................... 6

            2.    Testimony of Appointed Defense Lawyer Tony C. Miles ....... 11

            3.    Testimony of Appointed Defense Lawyer Mark Carroll .......... 20

    C.    The District Court's Rulings ......................................................... 26

SUMMARY OF ARGUMENTS ............................................................... 30

ARGUMENT AND CITATIONS OF AUTHORITY ...................................... 31

    Standards of Review .................................................................... 31

    Overview .................................................................................. 31

    I.    Wilkins Received Ineffective Assistance of Counsel Related to
         his Guilty Plea, and Should Now be Allowed to Withdraw his
         Plea ........................................................................................ 32

    II.    Wilkins Received Ineffective Assistance of Counsel Leading
         Up to and During His Sentencing Hearing ....................................... 37

III.     Resentencing is Warranted to Correct Restitution Errors..................49

CONCLUSION .......................................................................................52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bonner v. Wenerowicz*,
   2014 U.S. Dist. LEXIS 86544 (E.D. Pa. 2014) ...............................................45

*Faretta v. California*,
   422 U.S. 806 (1975) ...............................................32

*Hill v. Lockhart*,
   474 U.S. 52 (1985) ...............................................32

*In re Sealed Case*,
   488 F.3d 1011 (D.C. Cir. 2007) ...............................................32

*McCoy v. Louisiana*,
   No. 16-8225 (S. Ct.) (*cert. granted* Oct. 8, 2017) ...............................................32

*State v. Aplaca*,
   74 Haw. 54, 837 P.2d 1298 (1992) ...............................................43

*Strickland v. Washington*,
   466 U.S. 668 (1984) ...............................................26, 27, 31, 37

*United States v. Campbell*,
   2004 U.S. Dist. LEXIS 30260 (D.D.C. 2004) ...............................................51

*United States v. Cronic*,
   466 U.S. 648 (1984) ...............................................34

*United States v. Gray*,
   878 F.2d 702 (3d Cir. 1989) ...............................................44

*United States v. Mitchell*,
   796 F. Supp. 13 (D.D.C. 1992) ...............................................44

*\* Denotes authorities principally ruled upon*

iv

*United States v. Toms*,
  396 F.3d 427 (D.C. Cir. 2005)......................................................31

*United States v. Weathers*,
  493 F.3d 229 (D.C. Cir. 2007).....................................................44

*Wiggins v. Smith*,
  539 U.S. 510 (2003).....................................................................44

*Woods v. McSwain*,
  2016 U.S. Dist. LEXIS 20921 (E.D. Mo. 2016) ..........................44

**CONSTITUTIONAL PROVISION**

U.S. CONST. amend. VI..................................................................32

**STATUTES**

18 U.S.C. § 3282(a) .....................................................................13

18 U.S.C. § 3553(a) ........................................................23, 43, 48

18 U.S.C. § 3614 ..........................................................................52

18 U.S.C. § 3742 ..........................................................................52

28 U.S.C. § 1291 ............................................................................1

28 U.S.C. § 2255 ............1, 2, 4, 5, 7, 8, 9, 10, 12, 17, 22, 26, 27, 34, 40, 45, 49, 52,

**RULE**

Fed. R. Crim. P. 36........................................................................52

**GUIDELINES**

U.S.S.G. § 1B1.3...................................................................................40, 41

U.S.S.G. § 5K1.1.........................................................................................22

U.S.S.G. § 5K2.23................. 3, 18, 19, 24, 25, 27, 30, 36, 37, 38, 39, 40, 41, 42, 45

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1291.  The district court had

subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 2255.

## STATEMENT OF ISSUES

I.      Whether Wilkins received ineffective assistance of counsel that now
        authorizes him, under 28 U.S.C. § 2255, to withdraw his guilty plea?

II.     Whether Wilkins received ineffective assistance of counsel at his sentencing
        that, under 28 U.S.C. § 2255, allows him to receive a new sentencing
        hearing?

III.    Whether this case should be remanded to correct certain restitution orders
        that are plainly wrong?

## STATEMENT OF THE CASE

### A.      Procedural Background

On September 17, 2013, a grand jury returned an Indictment against Dustin

X. Wilkins, charging him as the only defendant with conspiracy (Count 1), wire

fraud (Counts 2-9), access device fraud (Counts 10-11), and first-degree fraud

under the D.C. Code (Counts 12-14).  JA:24.  As Judge Bates later summarized

below, the listed crimes were part of "a fraudulent debit card scheme."  JA:820.

Most of the Indictment's listed charges were dated.  JA:26 (2013 Indictment

alleges conspiracy from June 2008-April 2010).  By the time this indictment was

returned, Wilkins had already been convicted in a Henrico County, Virginia state

1

case involving one of these same debit cards, on which he had received a 3-year

custodial sentence, and spent 31 months in Virginia jails.

On October 8, 2013, more than three years after his last indicted act, and at a

point in time after Wilkins had already been released from custody by Virginia,

Wilkins was suddenly arrested on the instant federal case, and he made his initial

appearance in federal court.  Tony W. Miles, an attorney with the D.C. Federal

Public Defender's Office, was appointed to represent him.

Although the Indictment (and its forfeiture provision) listed a total of only

$35,615.73 in losses, a Statement of the Offense later entered at Wilkins' guilty

plea stated that the parties had agreed that the total amount of loss for relevant

conduct purposes was almost three times higher:  $106,668.29.  Many of these

additional loss amounts arose from alleged past conduct that had occurred more

than five years before Wilkins' guilty plea date of June 20, 2014.  *See* JA:708

(admitted below for demonstrative purposes only).  On June 20, 2014, Wilkins

pled guilty to Count Two of the Indictment, but as a part of that plea, he agreed to

$106,668.29 as the relevant conduct amount of loss.  JA:47 & 1352.

Shortly after the entry of this guilty plea, as exhibits presented at Wilkins'

§ 2255 proceedings would later reveal, Wilkins communicated to his attorney,

Miles, that as he had complained before, he still contested certain of these stated

loss amounts, and wanted them investigated further; Wilkins also conveyed that he

2

had not fully understood his plea proceedings or his rights at that time, and wanted to withdraw his guilty plea.  No such motion was ever filed by Miles, but before Wilkins was sentenced, on June 10, 2015, the District Court later granted Miles' motion to withdraw as Wilkins' counsel, and appointed Mark J. Carroll as replacement counsel for Wilkins.

As his September 16, 2015 sentencing date approached, Carroll filed a sentencing memorandum on Wilkins' behalf, JA:1404, which did not seek a downward variance, and asked for the same sentence the Assistant U.S. Attorney was requesting – 33 months of incarceration, at the low end of Wilkins' 33-41 month Sentencing Guideline range.  In particular, no request at all was made for any downward variance by citing or analogizing U.S.S.G. § 5K2.23, even though Wilkins had already served 31 months in custody on a Virginia state case which had involved this same type of conduct, during the very same time frame, for using one of the very same debit cards at issue in the instant case.

Wilkins' case then proceeded to sentencing, where he received a 33-month sentence.  JA:92.  At the hearing, and unlike his sentencing memorandum, Carroll now did briefly ask the Court for a downward variance, but did not provide any specific justification or citations for that request.  JA:68.  In particular, Carroll never mentioned Wilkins' substantial prior jail time spent on his state case in Virginia, and never referenced U.S.S.G. § 5K2.23 at all.

3

After Wilkins received a custodial sentence of 33 months, a Notice of Appeal was filed. JA:91. Wilkins also began submitting on his own various *pro se* filings in the district court, asking to withdraw his plea, and specifically alleging ineffective assistance by his appointed counsel. *E.g.,* JA:103 & 105

A new lawyer, Edward C. Sussman, was appointed to represent Wilkins. Because Wilkins' stated issues appeared to focus on ineffective assistance of counsel, and since no evidentiary record on that issue had yet been developed, Sussman decided it was best to dismiss Wilkins' appeal and raise these issues instead in a post-conviction petition under 28 U.S.C. § 2255. A petition under § 2255 petition was accepted for filing November 30, 2015, JA:107, and an order dismissing his direct appeal was issued on December 10, 2015. JA:114.

On December 22, 2015, Judge Bates denied Wilkins' request to further extend his self-surrender date. JA:115. Wilkins then sought to file a *pro se* request to reconsider that ruling (which was denied). Shortly thereafter, private counsel Bernard Grimm briefly filed, but then withdrew, a motion on Wilkins' behalf seeking an expedited hearing to extend Wilkins' reporting date. JA:124,129. Grimm never entered an appearance, but during the brief window when his motion was pending, Sussman moved to withdraw as Wilkins' counsel. JA:127. Wilkins surrender date arrived and he reported as required.

On January 5, 2016, Edward C. Sussman's appointment as Wilkins' counsel was terminated. Undersigned counsel was appointed for Wilkins in his § 2255 proceedings, and entered an appearance February 3, 2016. JA:132.

On June 1, 2016, Wilkins' § 2255 petition was supplemented and expanded to include not only a request to withdraw his plea, but also a request for a new sentencing hearing. JA:133. Wilkins' § 2255 petition was supplemented again on September 15, 2016, within the 1-year filing window. JA:150.

**B.     Summary of Wilkins' § 2255 Proceedings**

In his § 2255 submissions below, Wilkins asked for his conviction to be vacated, arguing that his plea agreement (which had basically tripled the relevant conduct amount above what the Indictment had alleged) had not been knowingly and intelligently entered, since Wilkins would have been within his legal rights in contesting these additions. Wilkins said he was unaware of that right, and this calculation therefore never made it into his assessment of whether to plead guilty or take this case to trial. He also asked for a new sentencing hearing, based on ineffective assistance of counsel in connection with his sentencing.

Various additional filings, status conferences and directed briefings ensued, culminating in an evidentiary hearing held on November 28-29, 2016. That evidentiary hearing included the submission of numerous documentary exhibits,

5

plus live testimony from both Wilkins and the two appointed lawyers he claimed

had provided ineffective assistance of counsel:  Miles and Carroll.

### 1.      Testimony of Petitioner Wilkins and Documentary Exhibits

Wilkins testified first, and he stated that his first attorney, Miles, had often

been insulting, and seemed like a second prosecutor.  JA:185-86.  This was his first

time in the federal criminal justice system, and he swore there had never been any

discussion with Miles about how most of the losses being included in his plea

agreement were over five years old at that time, or how they might thus be

challengeable as beyond the statute of limitations. JA:220-22.  Wilkins stated that

he would not have pleaded guilty if he had received competent counsel, and

instead would have fought the charges and loss amounts.  JA:413-14.  Among

other items, Wilkins disagreed with the plea agreement's $106,668.29 stated loss

amount, and said he had pleaded guilty only because his requests to his lawyer for

witness interviews had been rebuffed, and he felt helpless. JA:259-60. He later

sought to withdraw his plea, but said that by the time Carroll entered the case, he

was told it was too late to do so. JA:267.  With respect to sentencing, Wilkins said

he never saw Carroll's sentencing memorandum before it was filed, JA:279-80,

and that Carroll never held any discussions with him about seeking a downward

variance. JA:270,280.  He stated that Carroll had never brought to the Court's

attention the fact that almost all his charged offenses were 5-8 years old by the

time of his sentencing, or the mitigating factor that this case forced him to cancel an audition to perform in a NBC live performance of "The Wiz" – collateral punishment thus already suffered. JA:283-84.  He also testified there had been no discussions at all with Carroll about Wilkins' Henrico County, Virginia conviction possibly being a "related" case. JA:290-91.

Beyond Wilkins' testimony, many exhibits were introduced at Wilkins' § 2255 hearing – mostly documents from the Government's underlying discovery in the criminal case – revealing serious problems with certain loss amounts in this case, which were added to his Judgment & Commitment Order as restitution.[1]  A sampling of such questionable loss amounts included the following:

May 2007 charges from the Capitol Hilton claimed $7445.90 in losses, despite the hotel's own notation that no charges should be authorized above $5690. JA:712.  Wilkins was charged for two rooms, and a spa charge from an unrelated third room never included on his folio was also oddly added onto his bill.  JA:713-14.  Also specifically referenced was an AmeriPark credit, JA:720, which, at his § 2255 hearing, Wilkins explained arose after a valet driver took his parked vehicle to New Jersey, yielding an expected write-off of his hotel charges, JA:310-12, but no such credit was applied to his bill.

---

[1] As below, Wilkins' issues on appeal are not dependent on his own testimony, but arise primarily from documentary exhibits plus the testimony of Messrs. Miles and Carroll.  *See, e.g.,* JA:833-34 (Wilkins' testimony not credited).

December 2007 charges from the Mandarin similarly charged him for two separate rooms, JA:721; similar to the Capitol Hilton above, at his § 2255 hearing, Wilkins testified he had never authorized charges for two rooms. JA:308,313.

December 2007 charges at the Park Hyatt claimed Wilkins had stayed there during the same dates when other documents showed he was simultaneously being charged for a stay at the Essex House in New York City. JA:727-30.  At his § 2255 hearing, Wilkins testified he had only stayed at Essex House, and had never authorized these charges at the Park Hyatt in December 2007. JA:316-20.

February 2008 charges at the Ritz charges involved two separate folios with different departure dates.  JA:731-33.  At his § 2255 hearing, Wilkins again testified that he never authorized charges for two separate rooms. JA:328.

May 2008 charges at the Four Seasons involved charges above a stated $4500 cap, JA:734, plus the stay dates overlapped with his stay at a different hotel (Hotel George) during the same period, JA:742-43; Wilkins testified he had never stayed at the Four Seasons or authorized these charges. JA:336-37.

May 2008 charges at the Fairmont Hotel involved $1747.70 in charges attributed to Wilkins in this case, encompassing a limousine loss of $1050 which *the hotel's own records admitted the hotel had not incurred.* JA:746.

The May 2008 Melrose Hotel's charges were for a stay during dates that overlapped with the Fairmont Hotel stay dates above, JA:747-49; at his § 2255

hearing, Wilkins testified that he did not stay at the Melrose or ever authorize its charges. JA:345.

The June 2008 Renaissance's charges, JA:750-53, were for a stay that overlapped with stay dates at the Parker Meridian in New York, JA:754-55; at his § 2255 hearing, Wilkins testified that he did not stay at the Renaissance or authorize these charges. JA:349.

The June 2008 Willard Hotel's records showed that after hotel personnel grew suspicious of Wilkins during his stay, the Willard had changed the locks to his room, JA:760-61; despite this, the Willard's bill, JA:756-59, continued to charge him for these dates even after it had locked him out of his room.

 The July-August 2008 Donovan House's records appeared to show that in September 2008, it had been able to process all the charges, JA:770; at his § 2255 hearing, Wilkins stated his understanding that Donovan got paid. JA:363-64.

For a February 2009 Madison Hotel stay, a statement described how Wilkins had refused a rate hike and checked out of the hotel, JA:793-94, yet its folio revealed it still charged him for extra days at the higher rate anyway. JA:775.

Based on a March 2010 charge, Wilkins was also held responsible for a $900.20 Abe's Limousine reservation, even though Abe's own records described how its own investigation found an "individual posed as Wilkins," and how "[s]omeone close to Xavier knows his tricks and is using his name." JA:798.

Around that same time, Wilkins was also held responsible for a $2448.15 Hertz rental charge in April 2010, even though his name was badly misspelled on Hertz's forms, JA:799, and documents also showed a vehicle return date of April 24, 2010, JA:803 – almost a week after Wilkins had been incarcerated on his Virginia state case, starting April 18, 2010.  JA:402.

At the Aloft Hotel, Wilkins' folio included charges for staying there during April 16-20, 2010, JA:804-05 – thus including dates when he was incarcerated in Henrico County, Virginia, and could not have stayed at the Aloft.

In January 2013, Abe's Limousine claimed $1235.00 in losses, after claiming Wilkins was off and picked him up at the W Hotel, JA:807,809 – despite W Hotel's records stating that "Wilkins never arrived." JA:814.

After a September 2013 stay at the Hyatt Arlington, Wilkins was held responsible for $587.23 in losses, despite the Hyatt's own records showing his card used for that stay did not match any of the suspect cards in this case.  JA:815-17. The hotel's own records also revealed "The funds were paid to our bank."  JA:818. At his § 2255 hearing, Wilkins testified to his understanding that the Hyatt was fully paid for the $587.23 in charges for this 2013 hotel stay. JA:410-12.

As Wilkins noted during his § 2255 hearing, none of these issues were investigated by his counsel.  Certain debit/credit cards at issue in this case did not even include Wilkins' name on them, JA:710-11, and as the Abe's Limousine

10

documents revealed, some evidence of "copycatting" existed. There was much written on the Internet about Wilkins, both positive and negative, JA:169-74, and blogs often discussed his interactions with various celebrities. JA:659-88.

### 2.      Testimony of Appointed Defense Lawyer Tony C. Miles

Miles was later called a witness, and he admitted Wilkins had questioned his total stated loss amount, including on multiple occasions before he entered his guilty plea. JA:558. Miles said Wilkins did question this loss amount before his guilty plea, and he did question it later. JA:606. But "on the day he pled guilty, he told me he agrees with everything in the plea agreement." JA:605. While Miles suggested that was not the only day he agreed, and he also claimed he had reviewed all of the Government's discovery, he admitted "we did not go over all the discovery associated with each vendor together." JA:566.

Rather than scrutinizing the Government's discovery critically, and finding discrepancies, Miles appears to have largely tried to turn this issue back on Wilkins, demanding that Wilkins identify and bring any such issues to him. Miles admitted that Wilkins had specifically questioned one such charge, involving the Aloft Hotel charge that Wilkins said was invalid since he was incarcerated in Virginia during certain stay dates. Miles said his office investigator then checked into that issue, but he claimed "I didn't see a conflict," since he described the dates as merely "close." JA:533. Miles said, "I recall that after reviewing the

11

information about the dates, comparing it with the records, that there was not an overlap." JA:564.  As the actual exhibits revealed, however, this was simply wrong; the dates were not merely "close," but plainly overlapped.  Miles' office had received written verification that Wilkins was in jail on April 19 & 20, 2010, JA:535,691-93, during the same dates when Wilkins was charged with staying at the hotel. JA:594.  After being shown this exhibit during the § 2255 hearing, Miles admitted he was wrong: "[R]ight now I see the documents and I see that there is [an overlap].  The end of one of the stays overlaps a little bit with the jail stay." JA:564.  Miles nevertheless claimed that while Wilkins "didn't accept it immediately," Wilkins had eventually become "satisfied" with "whatever reason" Miles had come up with at the time as to "why it didn't prove that he didn't stay at that particular hotel."  JA:565.

No other discrepancies in the charged loss amounts were ever explored.  For example, with respect to the Fairmont Hotel's listed loss amount, Miles at the § 2255 hearing acknowledged that the Fairmont's own documents, which had been produced in Government discovery, "says that they did not lose a thousand fifty of charges for limo services.  It indicates the loss was 700." JA:569-70.  Miles said "I don't recall" when asked if he had ever noticed this discrepancy before.  JA:570.  No objection was lodged, and Wilkins was ultimately ordered to pay not $700, but $1747.70 to the Fairmont Hotel as its restitution.

The Government's discovery also revealed sometimes eye-popping charges claimed by these hotels, raising questions about whether all of its claims were for true "losses" they had actually incurred – such as one instance of $300.00 charged for a rollaway bed, another involving limousine charges of more than $7000.00 for two nights, and listed charges such as $4.40 for a Sprite, $4.13 for a Milky Way, and $4.40 for orange juice. Looking at the various loss issues, however, Miles said he did "not recall" if he had ever found a single dollar or penny to challenge in any of the Government's listed loss amounts. JA:571.

As noted, as a part of Wilkins' guilty plea, the Government sought to significantly expand the loss amounts attributable to him, by almost three-fold. In particular, the Statement of Offense sought to expand his stated losses from the $35,615.73 delineated in the federal Indictment, to a total amount of $106,668.29. JA:707-08. As previously noted, however, this federal Indictment had not been returned until more than three years had passed after the indicted events, and most of these newly-added alleged loss amounts were older still. By the time a plea agreement was proposed, the Government's ability to prosecute Wilkins for these extra, older financial charges was dubious. During all times when Wilkins' guilty plea was being negotiated, the vast majority of these newly-added losses were more than five years old, and thus outside the statute of limitations window for prosecution of non-capital federal crimes. *See* 18 U.S.C. § 3282(a).

13

PUBLIC COPY - SEALED MATERIAL DELETED

Miles claimed that he was aware that many of these newly-added charges

were more than five years old by the time Wilkins' plea negotiations took place.

JA:561. He nevertheless acknowledged that "I can't say that I did" when asked if

he had ever talked to Wilkins about potential statute of limitations defenses that

might have barred the Government from holding him accountable for these extra

losses. JA:561-62.[2]

Miles also acknowledged that the Statement of Offense had expanded not

only the loss amounts, but also the dates of the charged offenses – from the

conspiracy charge's narrower window of 2008-10 to a far broader window of May

2007 through September 2013. JA:560-61. Miles could not recall if any changes

had ever been made to the Government-drafted Statement of Offense. JA:587.

This expansion of dates, which also added two small 2013 charges, led to Wilkins

_____

[2] Although he admitted that he did not recall ever discussing the statute of
limitations with Wilkins, Miles did suggest that the Government perhaps could
have tried to supersede the Indictment to expand its conspiracy charge to include
the older credit card charges included in the Statement of Offense – but he also
conceded that the Government's evidence of conspiracy was always disputed by
Wilkins. Wilkins had consistently denied that any other criminal actors were
involved in these matters, even when that cut against his own interests. For
example, Wilkins told Miles he was unable to admit to a conspiracy, even after
learning that a conspiracy plea might reduce his Sentencing Guideline score, by
reducing his Base Offense Level from 7 to 6. JA:460-61. ████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████

receiving two additional criminal history points, since the newly-added 2013 acts of relevant conduct (though not in the Indictment) were at times when Wilkins was subject to the 2010 Henrico, Virginia sentence.

Miles described how Wilkins agreed to plead guilty, and also then admitted under oath to the facts as stated in the Statement of Offense. But within days, Wilkins clearly resumed, in his communications with Miles, his questions about the loss amounts described therein, JA:536, and also requested to withdraw his guilty plea, at times before his sentencing date. JA:574-75. Miles did not deny that Wilkins' requests to withdraw his guilty plea, similar to the one at JA:694-95, started almost immediately after his guilty plea – in fact, the Monday thereafter. JA:575 ("it may have been"). In his email at JA:694-95 Wilkins also stated that, by that August 2014 date, this request had been made on multiple occasions; Miles could not say this was inaccurate. JA:584. Miles said he told Wilkins that he (Miles) would need to withdraw as counsel if Wilkins wanted to withdraw his guilty plea. JA:537. Miles explained that "[h]e did ask me to get off his case or to withdraw on several occasions, and on each occasion I'd have a conversation … [and] until the end, he always ultimately did not want me off." JA:577. Miles said these discussions occurred on "multiple" occasions. JA:580. During this time, Miles did not deny that Wilkins said he had "asked you several months ago to

15

authenticate the dollar amounts and re-interview some of the witnesses who the Government says are victims." JA:584,694-95.

Miles said he responded by trying to turn such requests back onto Wilkins: "I remember that would come up a few times, and I would ask him to tell me, you know – I looked at the discovery. I didn't find any issues, and I asked him to point out any concerns that he had so I can look at it and evaluate it." JA:584-85. Miles admitted that neither he nor anyone at the Federal Public Defender's office ever interviewed any hotel or other witnesses the Government claimed had identified Wilkins as the person involved in these charges. JA:549.[3]

After receiving Wilkins' initial Presentence Report, Miles claimed he had sent it onto Wilkins, but admitted he had nothing in writing verifying it was ever sent. JA:590. The Probation Office's acknowledgement and receipt form for that initial Presentence Report, showed only Miles' signature, and not Wilkins' signature. JA:590,696. Although Miles felt sure he had sent this PSR onto his client, Wilkins' subsequent lawyer, Mark Carroll, later recalled emailing a copy of the PSR to Wilkins after he had entered this case, and said it "would not surprise me" if Wilkins had told him he had never received the PSR before that time. JA:628-29.

---

[3] Miles stated that the only phone call he ever placed was to a single hotel, where he spoke to "whoever picked up the phone" about its credit card charging procedures. JA:549. He could not recall if Wilkins had specifically given him the name of a Palomar employee to contact about excessive charges. JA:549-50.

16

Miles did prepare and submit PSR objections, none of which affected Wilkins' Guideline range.  Miles could not say with certainty whether he had ever shown this submission to Wilkins before it was sent in.  JA:590-91.  The PSR was also notable, among other reasons, for what it affirmatively showed:  even if Miles had somehow been unable on his own to discern from the Government's discovery that Wilkins was being charged for stays in *different hotels during the same periods of time*, this became crystal clear from the PSR's own descriptions.  In particular, page 9 of the PSR showed that Wilkins was being charged for hotel stays at the Four Seasons and the Hotel George on some of the same days.  JA:709.  Upon being shown PSR page 9 at the § 2255 hearing, Miles confirmed these overlapping stay dates.  Asked if he had noticed that before, Miles said, "I don't recall if I noticed or not"; he also said he could not recall if he had ever discussed this discrepancy with Wilkins. JA:592-93.

Similarly, this same page 9 of the PSR showed that the stay dates for Wilkins' charges at the Fairmont and Melrose Hotels also overlapped. JA:709.  After being shown this at the § 2255 hearing, Miles again confirmed the overlapping stay dates, but he could not recall if he had noticed this at the time, or discussed it with Wilkins. JA:594.  Ultimately, in his PSR objections, Miles never questioned or objected to any of the claimed loss amounts. JA:595.

In addition, and notably, Paragraph 61 of the PSR described Wilkins' prior Henrico, Virginia credit card conviction on which Wilkins had received three years

17

of custody JA:591, yielding 3 criminal history points under the U.S. Sentencing Guidelines.  JA:596,598-99.  As noted in Paragraph 63, that same conviction had also added another two points onto Wilkins' criminal history score under the Guidelines, based on a finding that Wilkins had committed the instant offense (i.e., newly-added 2013 charges) while under the criminal justice sentence in that Henrico, Virginia state case. JA:599.  So this Henrico, Virginia case alone added 5 criminal history points to Wilkins' Criminal History score.

Miles did not file any PSR objections claiming that this Virginia prior conviction and the instant Indictment involved the same relevant conduct.  Miles agreed "there was some similarity" between that case and this one, since "the charge is similar." JA:598.  He did not recall if he knew the PrivaCash card used in that Virginia state case had involved one of the same cards used in the allegations of the instant federal indictment. JA:597. Miles did acknowledge, however, "there's a presumption of a concurrent time with related cases." JA:598.

Although such concurrent time was no longer possible here – since the Virginia term of incarceration had already been fully served by the time the federal government finally got around to indicting Wilkins here – the U.S. Sentencing Guidelines include a specific, encouraged downward departure that can accomplish the same result in such situations, under U.S.S.G. § 5K2.23.  Miles said he was familiar with U.S.S.G. § 5K2.23, but said he did not raise it in Wilkins' PSR

objections because the plea agreement did not allow for such downward

departures.  Miles admitted he had allowed this plea agreement to proceed without

a § 5K2.23 carve-out, and further admitted he had never even asked the prosecutor

to include such a carve-out. JA:600-01.  Asked if he had ever discussed with

Wilkins the fact that, under this plea agreement, he would be giving up his right to

seek a downward departure under § 5K2.23, Miles said, "I doubt I ever had that

specific discussion with him."  JA:604.

Asked whether he found it troubling "that Wilkins' Virginia credit card

fraud case, involving the same credit card, the same time frame, the same type of

charge, and the fact that he served three years on that would not be something that

he could get credited for in the federal court unless you did something further,"

Miles made it clear that he actually *did* intend to raise this issue at sentencing, by

means of a downward variance request – and he further made it clear that this issue

*should* be raised on Wilkins' behalf at his sentencing hearing:

> I remember his criminal history, and I recall a variance
> could be an argument that could be made at sentencing
> [under the plea agreement].  My practice is I don't talk
> about variances in my objections to the presentence report.
> I do those in the sentencing memorandum.  But I think that
> if I were to represent him at sentencing, ***that's an issue that
> should be argued to get a below-guideline sentence.***

JA:602 (emphasis added).  *Accord* JA:603 ("I know I planned to argue for [that].").

Throughout his representation of Wilkins, Miles acknowledged that his relationship with Wilkins had at times been "sour" JA:536, with their attorney-client conversations even "heated." JA:556. Miles acknowledged that he had "probably raised my voice" at Wilkins, and admitted he had called Wilkins "a manipulator." JA:557. Miles also did not deny that he might have called his own client "a liar" during their conversations. JA:557-58.

By May 22, 2015, Wilkins asked Miles to get off his case again, and Miles eventually brought that issue to the Court's attention, on June 9. JA:578-80. In the interim, with Miles declining to raise issues as requested, Wilkins had even gone so far as to ask Miles to provide the prosecutor's contact information, so he could try to contact the prosecutor directly. JA:582-83. Miles never asked the Court to withdraw Miles' plea at all, however, even though Wilkins had asked him to do that, and even though "in June, he insisted that this is what he wanted to do." JA:580-81. Rather than moving to withdraw Wilkins' plea, Miles simply moved to withdraw as his counsel in this case, claiming that Wilkins' request had created a conflict of interest for him.

### 3.    Testimony of Appointed Defense Lawyer Mark Carroll

Attorney Mark Carroll was then appointed as replacement counsel for Wilkins. JA:611. Carroll, a former FBI agent and federal prosecutor, stated his own personal view that Wilkins was "fortunate to get the plea offer that he did,"

20

JA:618, and he repeatedly called the 33-month prison term that Wilkins had received "a good sentence." JA:622,638.[4]

Carroll admitted he had never moved to withdraw this guilty plea, and said this was because Wilkins never asked him to. He claimed that Miles had never told him Wilkins had requested to withdraw his plea. JA:644.[5]

Carroll did not file additional PSR objections beyond what Miles had already filed. He also agreed that he probably never met with Wilkins in person on any occasion other than days when they had a court hearing. JA:630. Carroll did file a sentencing memorandum for Wilkins, but it sought nothing more than the very same sentence the prosecutor himself was requesting – the low end of Wilkins' 33-41 month Guideline range. JA:638,1404,1409.[6]

---

[4] Carroll also disparagingly described how "[h]e behaved like a diva," JA:616, and stated "He is a diva, yes. He is a diva. There's no doubt," although he also claimed that he did not consider this description disrespectful. JA:625. Carroll also went out of his way during his testimony to describe how "he impressed upon me and everyone I've read that he was like the ultimate diva walking into a hotel lobby, you know, sashaying with the hands going." JA:616.

[5] Asked if he had been surprised that Wilkins had so quickly made a *pro se* filing seeking to withdraw his plea, so soon after the sentencing hearing ended, Carroll stated, "Nothing my clients do surprise me." JA:627.

[6] Carroll admitted he never pointed out to the Court that almost all of Wilkins' charges were dated (5-8 years old), stating he didn't do that because it was "obvious." JA:647. He also never mentioned to the Court Wilkins' lost "Wiz" audition, claiming "I didn't think it would be helpful." JA:647-48. *Compare* JA:67 (arguing instead at sentencing that "he's a thief, but not a very good thief.")

PUBLIC COPY – SEALED MATERIAL DELETED

During Wilkins' sentencing hearing, Carroll did argue briefly for a downward variance, but it consisted of only a few lines in the sentencing transcript. JA:68. No citations were offered, and no reason was even given by Carroll for this downward variance request, other than a short, generic claim that a 33-month sentence "might be a little excessive," JA:68 – which of course contrasted with his *own sentencing memorandum*'s request for *that very same sentence*. JA:1408.

At the § 2255 hearing, Carroll attempted to defend this position by essentially asserting that making good legal arguments for his client would have been bad. "I didn't argue for more than that because I thought it would hurt my client." JA:621. *Accord* JA:1328. Although he initially said he had told his client that a downward departure or variance should not be sought in this particular case, because "we don't want to eat with both hands," JA:1329,[7] Carroll admitted that in fact he *did* ask for a downward variance later, but said, "I did it softly." JA:636. "I thought it would be insulting to a court to be asking, when all was said and done, at 33 months … You insult the court when you say, well, we want to go lower than this." JA:637.

Asked whether he had discussed with this client this idea of not asking for a downward variance until the sentencing hearing itself, Carroll initially said:

> It wasn't an issue.  The plea agreement didn't allow for a variance on the guideline levels.  On paragraph (c) it said neither party will argue what the guideline levels are, but the defense was free to argue under 18 U.S.C. 3553(a), I believe.

JA:637.  After it was pointed out that 18 U.S.C. § 3553(a) is in fact the *source* of variances, and moreover that he ultimately *had* argued for a downward variance, albeit "softly," Carroll agreed that the plea agreement allowed such arguments JA:638.  Carroll also admitted that he not told Wilkins he was not going to be asking for a downward variance in his sentencing memorandum. JA:638.

Carroll contended that it would have been harmful to Wilkins "to stand up in front of the judge and argue, you know, he's a nice guy."  JA:1328.  But this explanation did not address the separate legal issue that had nothing to do with whether Wilkins was a good or bad person:  the fact that he was receiving no credit for any time he had previously served on his Henrico, Virginia state case, and how Wilkins was potentially being double-punished simply because of the different timing when his state and federal cases were prosecuted.

Asked about the fact that a 33-month federal sentence meant that Wilkins would not be getting any credit at all for his Virginia state case, Carroll initially tried to claim that "I don't think that this was part of the same scheme."  JA:639.

Carroll was then shown the Government's own sentencing memorandum filed in this federal case, which itself had specifically stated that "the Defendant was arrested and detained in Henrico County, Virginia, on a charge of credit card fraud in April 2009, *stemming from a virtually identical scheme* involving JetBlue Airlines." JA:639-40 (emphasis added). Carroll also said, "I didn't think it was the same credit card" used in that Virginia state case, admitting that he was unaware the very same card had been used there. JA:639. Carroll ultimately appeared to concede that the Henrico, Virginia state conviction involved not only the same time frame, not only the same card, but a virtually identical scheme to the current case, as the federal prosecutor himself had stated. JA:640.

Carroll then tried to explain his failure to raise this issue by discussing how he had had spoken on the phone with the U.S. Probation Officer to discuss various Guideline issues. Carroll claimed that "she pointed out how, because of the timing of the sentencing, that he would not get the benefit of it being a concurrent case, and also because of the timing of it, that it would count towards his criminal history points." JA:640. Carroll thus agreed that the reason Wilkins was not getting credit for this Virginia state time served was simply because of its timing. JA:640.

Carroll was then asked about U.S.S.G. § 5K2.23. Carroll claimed he was familiar with this guideline, but denied he had discussed this issue with Wilkins: "I

don't know if I ever referred to any of the guidelines specifically like that, because it would be lost on him, and any other clients as well." JA:642.

Asked if he had told Wilkins that a potential departure, or at least a variance on similar grounds, could be brought based on the notion that Wilkins was unable to get any concurrent time on this related case, Carroll initially seemed to misapprehend what U.S.S.G. § 5K2.23 allows, stating, "No, I didn't, because how could he get concurrent time if he's already done his time in Virginia on a state case and now this is a federal case?"  JA:642. Carroll was then asked, "[T]hat's what 5K2.23 is for, isn't it?  It's for discharge[d] terms of imprisonment where you can't argue for concurrent time anymore because your term of imprisonment on the previous case has been discharged, finished.  That's the whole purpose of the rule, isn't it?" JA:642.  Carroll then responded simply that "as his sentencing attorney, I did not raise that argument because I didn't think it would be helpful to him." JA:643.  Carroll claimed that at most, he and the U.S. Probation Officer "may" have touched on this issue, or not; he admitted he did not know whether they had ever discussed this particular guideline. JA:644.  Carroll also acknowledged that he had not performed any legal research of his own on § 5K2.23. JA:645.  And Carroll ultimately admitted that U.S.S.G. § 5K2.23 was never brought up at all during Wilkins' sentencing proceedings, either in Carroll's sentencing memorandum or in his court arguments. JA:644.  In short, this important legal

issue – which Miles himself testified "should" be raised at Wilkins' sentencing –
never was raised by either of Wilkins' lawyers, either before or during any of his
federal sentencing proceedings.

### C.    The District Court's Rulings

After the § 2255 evidentiary hearing concluded, and post-hearing briefs were
filed, Judge Bates issued his decision and an accompanying Memorandum
Opinion, on June 6, 2017.  JA:819,820.  While Judge Bates denied Wilkins'
request for § 2255 relief, his ruling was not an exoneration.  With respect to Miles,
the Court openly criticized certain of his actions.  For example, Judge Bates said
Miles' failure to investigate and resolve certain of the hotel discrepancies "fell
short of best practices," JA:835, although the Court also ultimately held that at
least this element of Miles work did not, in his opinion, fall "below an objective
standard of reasonableness" under *Strickland v. Washington*, 466 U.S. 668 (1984),
and was thus not constitutionally infirm.  With respect to Miles' failure to explore
Wilkins' potential statute of limitations defenses, however, Judge Bates was more
critical, affirmatively declaring that his representation was constitutionally
defective under *Strickland*:  "[T]he Court finds that Miles' performance—in failing
to identify, research, and consider a possible affirmative defense to approximately
half of the conduct that his client pleaded guilty to—was objectively
unreasonable."  JA:837.  Wilkins was denied § 2255 relief only because the Court

26

declared that despite these deficiencies, it believed Wilkins had "suffered no prejudice as a result of Miles' performance." JA:837.

 With respect to sentencing, and specifically with respect to Carroll's failure to seek a downward variance by citing U.S.S.G. § 5K2.23 – the argument that even Miles testified "should have" been raised – Judge Bates agreed that "[a] different lawyer could have reasonably reached a different decision" than Carroll. JA:848. Judge Bates also did not suggest that this issue, if it had been raised, would have made no difference; instead, he pointedly made no findings at all on the issue of prejudice, leaving that question open, specifically stating that "Carroll could have taken a different, more aggressive approach at sentencing, which *may or may not have benefitted Wilkins*." JA:848. The Court based its denial of relief solely on what it claimed was a "strategic choice" by Carroll, declaring only that "his failure to [present this argument] does not indicate that his performance was unreasonable under *Strickland* and *Abney*." JA:848.

 Judge Bates also acknowledged that, even beyond this "state jail credit" downward variance issue, there were "a host of [other] potentially beneficial arguments" at sentencing that Wilkins argued could have been, but were never, raised by his appointed sentencing counsel. In particular, the Court identified two points raised by Wilkins in his § 2255 proceedings, which had increased his score under the U.S. Sentencing Guidelines: (1) "the loss amounts used to calculate the

27

guidelines range," and (2) the two criminal history points added because of a finding that the instant offense occurred while he was under a criminal justice sentence for his Henrico County, Virginia conviction. Unless the Indictment had been expanded as the Statement of Offense allowed, both of these issues would have led to a lower guidelines score, since (1) the loss amounts in the Indictment were no more than $35,615.73, and (2) the Indictment's last listed crime had occurred in April 2010 – *before* the Henrico County conviction had been imposed on May 18, 2010. JA:843-44.

On these issues, the District Court held that these "[t]wo … arguments must fail because they contradict his plea agreement." JA:843. The District Court held that new attorney "Carroll could not have raised those arguments at the sentencing hearing without also asking the Court to allow Wilkins to withdraw his plea," JA:843 – thus finding that Carroll's hands were tied by the deal that Miles had negotiated. Judge Bates' Opinion never specifically addressed, however, Wilkins' separate argument that Miles' negotiation of a deal that foreclosed these two clearly viable sentencing arguments, without seeking any carve out, itself represented ineffective assistance of counsel. Judge Bates' Opinion also did not directly address Wilkins' separate argument that the evidence at his hearing proved beyond any doubt that the Judgment & Commitment Order was at times *simply*

28

*wrong*, with undisputed evidence verifying that Wilkins' sentence contains clear factual errors – including restitution ordered for *losses not owed*.

Following the District Court's ruling below, Wilkins filed a timely Notice of Appeal.  JA:849.  Thereafter, in an Order dated July 5, 2017, Judge Bates granted Wilkins a Certificate of Appealability, agreeing that he had made a "substantial showing of the denial of a constitutional right," both on his request to withdraw his plea and as to his request for a resentencing hearing:

> Although the Court denied his petition, the Court found that his counsel at the plea stage performed deficiently by failing to consider how a statute of limitations defense should affect Wilkins' decision to plea.  Nearly half of the loss amount is from conduct that occurred arguably outside the statute of limitations for the offense to which he pleaded guilty.  The Court found that no prejudice resulted from this deficient performance, but "reasonable jurists" could debate whether there is a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."
>
> Wilkins also asserted that competent counsel would have raised several arguments at the sentencing hearing based on the sentencing guidelines that could have led to a lower sentence.  In particular, Wilkins contended that his counsel should have argued that a prior offense was "relevant conduct" to the instant offense under § 1B1.3 of the United States Sentencing Guidelines, and therefore should not have counted as part of his criminal history score.  Although the Court determined that his counsel's performance was not "objectively unreasonable," it acknowledged that counsel could have raised this argument and that whether he should have done so is a "close[] call."  Thus, "reasonable jurists could debate

> whether … the petition should have been resolved in a
> different manner."

JA:850-51 (brackets in original; case citations omitted).

## SUMMARY OF ARGUMENTS

I.    Wilkins received ineffective assistance of counsel in connection with
his guilty plea, since his lawyer never advised him of the statute of
limitations defenses that could be interposed against half of the stated
losses he agreed to accept and repay, and because his lawyer also
failed to investigate, identify and discuss other mitigating arguments,
or seek any carve-outs to the plea agreement, which would have
allowed such mitigation to be presented at his sentencing.

II.   Wilkins received ineffective assistance of counsel in connection with
his sentencing, in part because his lawyers never argued that his
Henrico, Virginia conviction involved the same relevant conduct, thus
adding 5 criminal history points to his Sentencing Guidelines score.
His lawyers also were ineffective in failing to seek a downward
variance consistent with U.S.S.G. § 5K2.23.  Wilkins' first lawyer,
Miles, even agreed that this "should" have been done, but Wilkins'
second lawyer, Carroll, never raised this issue, and never discussed
this "encouraged" downward departure ground with Wilkins before
waiving it.  Judge Bates did not deny that this argument may have led

30

to a different sentence if it had been raised, and a remand for a

determination of prejudice is warranted.

III.    Wilkins' restitution order is factually wrong, due at least in part to

ineffective assistance of counsel, and should be vacated or modified.

## ARGUMENT AND CITATIONS OF AUTHORITY

### Standards of Review

Claims of ineffective assistance of counsel should be reviewed *de novo*. *Cf.*

*United States v. Toms*, 396 F.3d 427, 433 (D.C. Cir. 2005) (declining to settle

standard of review, but noting other Circuits' *de novo* review in this context).

### Overview

As the United States Supreme Court has held, "the right to counsel is the

right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S.

668, 686 (1984). Under the standards established in *Strickland*, a defendant

claiming ineffective assistance of counsel must meet a two-part test. "First, the

defendant must show that counsel's performance was deficient." 466 U.S. at 687.

And "[s]econd, the defendant must show that the deficient performance prejudiced

the defense." *Id*. *Strickland*'s two-part test is satisfied under the facts of this case.

Throughout these proceedings, and as explained in more detail below,

Wilkins did not receive adequate "assistance" of counsel in his criminal case. Too

often he was never even informed of available options, by lawyers who admitted

they assumed he was simply incapable of comprehending legal principles, and who

31

frequently made crucial choices for him, failing to raise legally viable arguments

because of their own view of what was best for him.  That paternalistic approach is

not how our criminal justice system is supposed to work; it is appropriately the

client, not the lawyer, who serves as the "master" of his defense.  *See Faretta v.*

*California*, 422 U.S. 806 (1975) (Sixth Amendment "speaks of the 'assistance' of

counsel … and an assistant, however expert, is still an assistant.").  *See also*

*McCoy v. Louisiana*, No. 16-8225 (S. Ct.) (*cert. granted* Oct. 8, 2017).  Clients

cannot be kept in the dark about their lawyers' key decisions, which may affect the

client's fate and freedom.  Wilkins did not receive adequate counsel, and he was

prejudiced thereby.  Reversal is warranted so § 2255 relief can be afforded.

## I.      Wilkins Received Ineffective Assistance of Counsel Related to his Guilty Plea, and Should Now be Allowed to Withdraw his Plea

"It is well-established that the validity of a guilty plea depends on 'whether

the plea represents a voluntary and intelligent choice,' and that 'the voluntariness

of the plea depends on whether counsel's advice satisfies the Sixth Amendment

guarantee of effective assistance.'" *In re Sealed Case*, 488 F.3d 1011, 1015 (D.C.

Cir. 2007) (quoting *Hill v. Lockhart*, 474 U.S. 52, 56 (1985)).  In order to be

intelligently entered, a criminal defendant must be adequately informed of his legal

rights, so he can logically understand and assess his legal options.  Critical to that

equation – especially for a person like Wilkins facing the federal criminal justice

system for the first time – is adequate legal analysis from his counsel.

32

Here, this federal case was not filed until several years after the indicted events.  And then, as discussions about Wilkins' possible guilty plea ensued, the Government sought to expand Wilkins alleged loss amount even further – and substantially, from the $35,615.73 delineated in the indictment to a total amount to $106,668.29.  By the time of the plea discussions, however, the Government's ability to prosecute him for these extra financial charges was dubious.  At all times when Wilkins' guilty plea was being negotiated, many of these losses were more than five years old, and outside of the general statute of limitations window for non-capital federal crimes.  *See* JA:708.

Wilkins' counsel, Miles, admitted he was aware that many of these charges were over 5 years old at the time of this guilty plea, but acknowledged "I can't say that I did" when asked if he had ever talked to Wilkins about potential statute of limitations defenses that might have barred Wilkins from being held accountable for those extra losses.  In this regard, Judge Bates agreed, in his Memorandum Opinion, that this never should have happened, and that Miles' performance was constitutionally deficient.  Judge Bates explained that, "because the Court cannot find any evidence that Miles exercised professional judgment at all regarding whether the statute of limitations provided a viable defense, or whether it was in Wilkins' interest to accept the plea deal anyway … the Court finds that Miles' performance—in failing to identify, research and consider a possible affirmative

33

defense to approximately half of the conduct that his client pleaded guilty to—was objectively unreasonable." JA:837.

Judge Bates denied Wilkins § 2255 relief only because he also found that "Wilkins suffered no prejudice as a result of Miles' [deficient] performance," declaring that there was "ample" evidence that there was no reasonable possibility that, but for counsel's errors, [Wilkins] would not have pleaded guilty and would have insisted on going to trial." JA:837. In reaching this conclusion, Judge Bates relied in part on views from Messrs. Miles and Carroll that the plea deal was favorable. JA:837-38. But this ignores the fact that this decision belonged to Wilkins, not his lawyers. *See United States v. Cronic*, 466 U.S. 648, 656-57 n.19 (1984) (lawyer is obligated to honor his client's wishes to stand trial and hold the government to its burden of proof regardless of whether lawyer finds client's desire to prove his innocence persuasive). Wilkins' plea agreement, in which he agreed that his relevant conduct amount would be *tripled* over what the indictment had alleged, was not intelligently entered. Wilkins clearly would have been within his legal rights to contest these additions, yet he was never even made aware of that right, and this calculation therefore never made it into his assessment of whether to plead. His decision to enter into this plea agreement was not a fully-informed, intelligent choice, and his plea properly ought to be vacated.

34

In evaluating prejudice, Judge Bates also claimed that he could examine the other charges Wilkins might have faced if he had insisted on a trial, including the conspiracy charge to which he did not plead guilty. JA:838.  In this regard, Judge Bates noted how Wilkins elsewhere had argued that "all of his conduct part of one continuous scheme," in an effort to establish that his Henrico, Virginia conviction was a related case.  Judge Bates then declared that, "[w]hile that might help his argument regarding sentencing … it hurts his argument here," declaring that "[i]f all of his conduct is one scheme, then it is likely all part of the same conspiracy." JA:838.  But this conclusion wrongly ignores the undisputed fact that Wilkins had repeatedly, consistently denied that any other person was a criminal actor in these transactions, and that a conspiracy even existed.  Indeed, even when it was plainly in his interest to say otherwise, such as when he was told that a plea to conspiracy could *reduce* his base offense level, Wilkins specifically declined to accept that version of the facts – with Miles himself acknowledging that it was quite possible no co-conspirators existed at all.  No others were ever charged or even named in this conspiracy, and Judge Bates' assumption that Wilkins somehow would have surely seen a conspiracy conviction as inevitable if he had gone to trial was both unwarranted and unsupported by any facts.  And the bottom line is that Wilkins was never informed of his choices before entering into this guilty plea.  Any claim

35

of how Wilkins would have reacted if he had known, for example, that half of his alleged losses might be challengeable as time-barred involves sheer speculation.

Just as importantly, Judge Bates' Memorandum Opinion also wholly ignores Wilkins' separate argument about other vital issues that could have been, but never were raised by Miles, or negotiated at all, in connection with this plea agreement. For example, as explained in more detail below, by entering into this plea agreement, with no carve-outs included or even sought by Miles, Wilkins clearly gave up important rights at sentencing, including his right to seek a downward departure under U.S.S.G. § 5K2.23.  Miles deemed this argument viable, and was thus ineffective in failing to *ever discuss* this issue with his client, and in admittedly failing to *even attempt* to get this departure ground included as a carve-out in this plea agreement that otherwise barred such downward departures.  The requirement of reasonable consultation was entirely absent, and had this issue been raised with Wilkins, he would have been entirely rational in insisting that his attorney at least ask for its inclusion before entering into a plea agreement that forfeited this important right.  Since U.S.S.G. § 5K2.23 involves an expressly "encouraged" departure ground, it cannot be assumed that the Government would have balked and insisted that it not be added to this plea agreement.  *See also* JA:417 (Judge Bates notes that "[w]e'll be missing something without having Last here, but that's a decision that counsel get to make").  Even if Wilkins might have

36

eventually entered into some type of guilty plea, it cannot be said that it would have been a guilty plea on the same terms, which here limited his sentencing arguments.[8]  At a minimum, it is more likely than not that these proceedings would have been different, which suffices to establish prejudice under *Strickland.* Wilkins' counsel, Miles, was ineffective in wholly failing to ever discuss these issues with Wilkins prior to his plea, and in failing to even to ask for reasonable protective plea terms, and reversal is warranted.

Wilkins' decision to enter into this plea agreement was not a fully-informed, intelligent choice, and his plea should now be vacated on this ground.

## II.    Wilkins Received Ineffective Assistance of Counsel Leading Up to and During His Sentencing Hearing

In the alternative, resentencing is required under § 2255, based on certain undisputed facts – from the mouths of Wilkins' previous counsel themselves:

- Miles admitted that with respect to Wilkins' Virginia credit card conviction (PSR ¶ 61, JA:1381-82), he never argued that case was a "related" case, and also did not recall ever checking to see if the same debit card had been used in that case as here.  JA:595-97.  If it was related, Miles agreed a presumption then should have existed that

---

[8] Miles acknowledged that the plea agreement barred him from raising this issue as a downward departure, and limited this issue to one in which he would instead be seeking only a downward variance, by analogy to U.S.S.G. § 5K2.23.

Wilkins' Virginia state jail time should run concurrent to the instant sentence – if its time had not already been served. JA:598.

- Miles also "was aware" of the issue that Wilkins would not receive any credit for his completed jail time served on his Henrico, Virginia credit card fraud case, JA:602, which Miles agreed had "some similarity, yes," to the instant case, because both cases involved the same time frame, same debit card, and both were credit card fraud cases JA:597-98. But as noted, he allowed the Plea Agreement to proceed without any carve-out allowing Wilkins to seek a downward departure under U.S.S.G. § 5K2.23. This was not because such a carve-out was impossible; Miles admitted that he simply never asked for one. JA:600-01. Miles also admitted he did not think he ever discussed with Wilkins whether to waive his § 5K2.23 rights before accepting the Plea Agreement. JA:604,1297.

- Miles did say he planned to argue for a downward variance on this same ground at sentencing, JA:602-03,604, but he withdrew as counsel prior to that sentencing hearing.

- Mark Carroll then entered as Wilkins' sentencing counsel, and did not seek a downward variance on any specific ground. While Carroll claimed he was familiar with U.S.S.G. § 5K2.23, he admitted he never

performed any legal research on § 5K2.23, did not know if he had

ever discussed § 5K2.23 with the U.S. Probation Officer JA:644-45,

and did not know if he had ever talked to Wilkins about U.S.S.G.

§ 5K2.23, claiming any such attempt "would be lost on him."  JA:642.

Carroll at first tried to claim he did not believe the instant case was

part of the same scheme as Wilkins' Virginia case, but later

acknowledged that even the Government had argued otherwise; his

assessment in this regard also was based on incomplete information,

since he too admitted that he was unaware that Wilkins' Virginia

credit card fraud conviction involved the same card used in the instant

case. JA:639-40.  Carroll admitted he never mentioned § 5K2.23 in

filings or at Wilkins' sentencing hearing, and never sought a

downward variance by analogy, under its rubric.

Carroll's failure to seek, or even discuss with his client, a downward

variance based on 31 months of time he had served[9] on a similar Virginia credit

card case stands in stark contrast to what Tony Miles himself agreed should have

been done in this case: "[T]hat's an issue that should be argued to get him a below-

---

[9] PSR ¶ 61 shows Wilkins was arrested 04/19/2010, then sentenced on
05/18/2010 to three years of custody.  He was released on 11/19/2012 – exactly
two years and 7 months (31 months) after his arrest. JA:1381.

guideline sentence." JA:602. *See also* JA:603-04 ("I know I planned to…. That is something I would have done.").

In evaluating Wilkins' § 2255 claims of ineffective assistance of counsel at sentencing, Judge Bates' Memorandum Opinion found that Carroll's performance was not deficient. With respect to certain issues, he found that certain sentencing arguments were foreclosed by the plea agreement itself – but did not address whether Miles' failure to discuss or seek potential carve-outs in that agreement independently represented ineffective assistance of counsel.[10] With respect to Wilkins' arguments related to his Henrico County conviction specifically, Judge Bates acknowledged that Wilkins had been "convicted in Henrico County for a fraudulent scheme similar to the one here." JA:844. Judge Bates then declared it a "close[] call"[11] whether Wilkins would have benefitted from Carroll raising U.S.S.G. § 1B1.3 or U.S.S.G. § 5K2.23. Nevertheless, Judge Bates cited Carroll's testimony that he had "considered" these arguments, but "ultimately rejected them." JA:846. With respect to whether Carroll's decision to reject them was

---

[10] With respect to certain issues raised, Judge Bates declared that "the gravamen of Wilkins' argument is that Carroll should have been more persuasive, not that there were valid arguments Carroll should have raised but did not." With respect to those arguments, Judge Bates said "Carroll's decision of when and how to raise these arguments is the type of strategic choice that does not support an ineffective assistance of counsel claim." JA:845.

[11] Although Judge Bates used the words "closer call" in his Memorandum Opinion, JA:847, his Order granting a Certificate of Appealability declared this a "close[] call." JA:851.

informed, Judge Bates conceded Carroll's "research consisted primarily of consulting with the probation officer who prepared the presentence investigative report." JA:846. With respect to the failure to raise U.S.S.G. § 1B1.3 – which could have reduced Wilkins' criminal history score by five points – Judge Bates declared it a "strategic choice" by Carroll, deeming sufficiently robust his contact with the probation officer, after which they "went over the guidelines together on the phone." JA:847.

With respect to U.S.S.G. § 5K2.23, Judge Bates acknowledged Carroll had "determined § 5K2.23 could technically apply." JA:847.[12] But Judge Bates then cited Carroll's testimony that "in his judgment he believed that using that section as the basis to ask for a below-guidelines sentence could be seen as asking for too much, and would ultimately 'hurt [Wilkins'] position.'" JA:847. Judge Bates acknowledged "[a] different attorney could have reasonably reached a different decision," JA:848 – an apparent nod to Miles' plans to raise it, and statement that it "should" be raised. Judge Bates also acknowledged that it could not be said that this argument would have made no difference at Wilkins' sentencing, since it was "[t]rue" that "Carroll could have taken a different, more aggressive, approach at

---

[12] Judge Bates did not explain how Carroll could reconcile his claim that § 5K2.23 could apply to his case, with a view that § 1B1.3 could not. Judge Bates' legal analysis was that the two issues likely rose or fell together. And he certainly never suggested that the Henrico County case was not part of the same relevant conduct – instead conceding that "[t]he acts underlying the Henrico County offense used a similar modus operandi…. a similar 'charge back' scheme." JA:846.

41

sentencing, which may or may not have benefitted Wilkins." JA:848.  Ultimately,

however, Judge Bates declared Carroll's failure to raise a § 5K2.23 argument "the

sort of judgment call that attorneys are expected to make at a sentencing hearing,

and which therefore are not appropriate for second-guessing through a collateral

attack." JA:848.  Never addressed by Judge Bates was the fact that Wilkins had

been kept in the dark, and never informed that he had this viable variance argument

that was not going to be presented.

The Court thus credited Carroll's claim that he feared Judge Bates might

somehow retaliate against his client if he, as Wilkins' lawyer, had the temerity to

seriously seek a sentence below the Guideline range.  Carroll sought to justify his

approach by claiming that arguing Wilkins was a "good guy"would have been

counterproductive.  There are problems with this analysis, however.

First, there seems little question that, viewed as a purely legal matter, this

downward variance argument was a viable one.  Miles even said it was an issue

that "should be argued."  Any notion that Carroll's decision, essentially arguing

that "raising a good legal claim for my client will be had for him," must be

honored as a "strategic choice" is problematic.[13]  If courts credit such claims, every

lawyer who is ever challenged as ineffective will be able to insulate himself from a

---

[13] As noted, the § 2255 hearing also showed that Carroll did not truly understand how U.S.S.G. § 5K2.23 works. [484-85] (Carroll asks how he could have argued for concurrent time on a sentence already served, seemingly unaware that § 5K2.23 departures are allowed precisely because of that problem).

42

§ 2255 challenge by incanting a "Bizarro world" theory that "good" may have been "bad."  Fear that a judge might retaliate against a lawyer who has the temerity to make a legal argument is not a recognized strategic choice.  *Cf. State v. Aplaca*, 74 Haw. 54, 71-72, 837 P.2d 1298 (1992) ("his reasoning for not making an offer of proof does not, as a matter of law, constitute trial strategy or a valid on-the-spot strategic choice.  As trial counsel testified, 'well, quite frankly, I didn't want to upset the judge.  That's one of the reasons.'") (declaring counsel's performance deficient, finding ineffective assistance of counsel, and reversing conviction and ordering new trial).  Indeed, if such actions were condoned, criminal justice itself would be diminished – yielding a system that keeps judges in the dark and unapprised of genuine, viable legal claims that may warrant a lower sentence, undermining the goal of courts' *statutory mandate* to impose a sentence "sufficient but not greater than necessary" under 18 U.S.C. § 3553(a).

Moreover, even if such "good arguments may be bad" assertion might be countenanced in certain limited circumstances, several prerequisites, at the least, should exist before a court can appropriately accept Carroll's strained contention below that he felt it was only appropriate to argue for a downward variance if he made that argument in a "soft," (i.e., insincere) manner.

First, any contention that raising a viable argument would harm the client would need to be based on complete information.  That was not true here.  While

Carroll expressed a view that this was not a "related" case, he acknowledged that his conclusion, which was neither obvious nor accepted by Judge Bates, had been reached by him *without knowing* that case had involved *the very same debit card* used here. *See, e.g., Woods v. McSwain*, 2016 U.S. Dist. LEXIS 20921, *17 (E.D. Mo. 2016) ("where there is evidence of lack of diligence in preparation and investigation by counsel, such strategic choices are not protected by the presumption in favor of counsel") (citations omitted); *United States v. Gray*, 878 F.2d 702 (3d Cir. 1989) ("counsel can hardly be said to have made a strategic choice … when s/he has not yet obtained the facts on which such a decision could be made"). *See also United States v. Weathers*, 493 F.3d 229, 236 (D.C. Cir. 2007) ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *United States v. Mitchell*, 796 F. Supp. 13, 16 (D.D.C. 1992) ("strategic choices made after incomplete investigation are only reasonable to the extent reasonable professional judgment supports the limits on the investigation"); *Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("court must consider the reasonableness of the investigation said to support that strategy").

Second, withholding a viable argument on the theory that it may harm the client cannot be countenanced absent the client's consent, or at least the client's knowledge. Here, while Carroll did claim that he generally discussed with Wilkins

the fact that he did not think it wise to, as he put it, "eat with both hands," he also

admitted to never discussing U.S.S.G. § 5K2.23 *at all* with Wilkins.  Any supposed

consent by Wilkins, therefore, could not possibly have been knowing and

intelligent.  As a non-lawyer facing his first federal criminal case, and with no

Guidelines experience at all, Wilkins could not possibly have signed off on or even

acceded to a strategic decision when he had no idea what it was about, or how

strong these arguments might be.  That is why a client consultation needed to occur

before Wilkins' potential challenge to five criminal history points, and possible

variance, was waived.  *Cf. Bonner v. Wenerowicz*, 2014 U.S. Dist. LEXIS 86544 at

*27 (E.D. Pa. 2014) (there was "no strategic basis for failure to [provide copies of

filed papers to client] and prejudice should be presumed since Petitioner was kept

'in the dark' about the issues and procedures").

     Finally, any decision to withhold a viable argument when representing a

client surely must logically flow from the stated premise for never raising it – not

simply from some stated "fear" that a judge might somehow retaliate against a

client for the lawyer's impertinence in asking for more (since such "fears" could be

cited in any § 2255 case, creating a loophole that swallows the rule).  Here, that

connection is absent.  Carroll said he saw risks in arguing that Wilkins was a "good

guy."  But to be clear, the instant argument had *absolutely nothing to do with*

whether Wilkins was a "good" or "bad" guy.  It was a *purely systemic* argument,

arising from the fact that his two convictions involved the same relevant conduct, and the risks he faced of stacked sentences in two jurisdictions, based purely on the timing of the prosecutions that made concurrent time impossible.

The key argument that ***never was***, but ***should have been made*** to this sentencing court was a compelling one – and an argument that had nothing whatsoever to do with Wilkins' character. It was the following:

> ***If you impose a 33-month sentence on Wilkins, that in reality will be a 64-month sentence for his criminal activity – because Wilkins has already served, on a related Virginia state case, which was based on this same type of conduct, during this very same time frame, and even using one of these same debit cards, 31 months in prison.*** If the sentence in that case had not been fully served before the federal government finally got around to prosecuting the instant case, your federal sentence would presumptively need to be run concurrent with that Virginia sentence – a presumption the Guidelines have codified for related cases. Because Wilkins' Virginia state sentence is now over, that option is presently impossible, but U.S.S.G. § 5K2.23 expressly permits a departure to accomplish this same objective in these circumstances – in what is even an "encouraged" downward departure ground. And even if not considered in the form of a departure, this Court can consider it in the form of a downward variance, since a new 33-month prison sentence is "greater than necessary" under § 3553 here: other people with Wilkins' exact same criminal history score and exact same relevant conduct do not end up with 64-month sentences, and this Court can adjust its sentence below the 33-month bottom of the Guidelines to take that into account. Indeed, even at the top of his Guidelines, Wilkins should ordinarily get only 41 months – not 64 months. ***Wilkins should not now end up doing nearly twice as much time in prison as other defendants***

46

> *in his same range – with similar crimes and criminal*
> *history scores – simply because these were staggered*
> *prosecutions by two separate jurisdictions.*

And, of course, the multiple-punishment inherent in such a stacked sentence was also ***on top of*** the negative impact that this Virginia state sentence had ***already*** imposed on Wilkins' Criminal History score – adding 5 criminal history points, *see* PSR ¶¶ 61 & 63, and moving him from a Criminal History Category III (6 points) to Criminal History Category V (11 points), PSR ¶ 64, thus changing his Sentencing Guideline Range from 24-30 months to 33-41 months. Those 5 points also could have, and should have been challenged, but never were.

Whether the deficiency here was in Miles' failure to ever ask for a specific carve-out from the Plea Agreement for U.S.S.G. § 5K2.23's "encouraged" downward departure, or in Carroll's failure to argue at sentencing this viable downward variance argument that even Miles agreed "should have" been made in this case – or both – the reality is that Wilkins's viable, below-guidelines double-punishment argument was never made, and he was never even told it existed. That was ineffective assistance of counsel.

Lawyers – even fine, experienced lawyers – do not get to "play God" (or judge) like this. The fact that Carroll may have *personally* felt 33 months here was a "good sentence," or his belief that Wilkins was "fortunate" or even "lucky" to get the deal he did, did not authorize him to decide on his own, in private, to

47

essentially hide viable legal arguments under a bushel.  Even if one wholly ignores

Carroll's troubling, mocking description of his ex-client as the "ultimate diva …

sashaying with the hands going," JA:616 and his public disclosure of a highly

personal secret his ex-client had plainly disclosed only in confidence, JA:649-50,

this Court cannot fairly countenance defense counsel unilaterally *burying* of this

substantial legal argument, not only from his own client, but also from a sentencing

court tasked with fashioning a sentence "not greater than necessary."  A sentence

of 33 months **_stacked on top of_** a 31-month Virginia sentence already served in a

related case **_was greater than necessary_** here.  Effective federal sentencing counsel

at a minimum reasonably should have pointed out this highly-relevant, legitimate

mitigating factor at Wilkins' sentencing hearing.[14]  And any Court applying

§ 3553(a) should have wanted to know it.

   Accordingly, Wilkins' counsel's performance at sentencing should be

deemed deficient, with this case remanded for a determination of prejudice, with

Wilkins ultimately afforded a resentencing hearing at which his viable, significant

mitigating legal issues can finally be considered by the court below, and factored

into an appropriate sentencing decision under 18 U.S.C. § 3553(a).

---

[14] There were also others, such as the fact that this long-delayed federal
prosecution, largely based on misconduct 5-7 years old, meant Wilkins' efforts to
restart his life after being released from the Virginia prison system – and new
opportunities such as a call-back for an audition in "The Wiz" in New York City –
had to be abandoned.

### III.     Resentencing is Warranted to Correct Restitution Errors

Documentary evidence at Wilkins' § 2255 hearing revealed that his sentence included an ordered to pay restitution for certain losses *never incurred*.  These problems went beyond credit card charges that were disputed; in several cases, the fact that the payments were not owed was clear and undisputed, even coming from the victim's own records.  These situations included the following:

At the Fairmont Hotel, for $1747.70 in restitution was ordered – even though the Fairmont's own documents verified that it had incurred a loss of only $700.  [185; Exhibit 50].

At the Madison Hotel, a restitution order of $5320.96 was based on room charges that increased substantially mid-stay – despite documents revealing that the hotel had noted Wilkins' decision to *refuse* an extended stay precisely because he was *unwilling* to pay this sharply higher rate.

Restitution payable both to Hertz and to the Aloft Hotel included charges for days during times when Wilkins was literally incarcerated in Virginia, over 150 miles away.

Restitution was also ordered for the Hyatt Arlington, even though records showed it had incurred no losses at all, with Government-produced documents verifying that they "got paid."

49

There are more examples, but there is no doubt that the current Judgment and Commitment Order includes restitution amounts that are factually inaccurate. These inaccuracies can be traced, at least in part, to ineffective assistance of counsel, in the form of deficiencies in adequately investigating facts, and a failure to subject the prosecution's evidence to meaningful adversarial testing.  In this case, Judge Bates acknowledged that Miles' performance in this regard "was not perfect," and that "[h]e could have done a more thorough investigation into the charges." JA:835.  With respect to the Hotel Aloft, for example, Judge Bates agreed that any view that there were no overlapping dates was "simply wrong," and that "[i]f Miles learned that Wilkins was incarcerated for only one of the five nights, he should have investigated why the hotel still charged Wilkins for a night when he did not stay there." JA:835.  While agreeing that "Miles' conduct on a few specific issues fell short of best practices," however, Judge Bates nevertheless declared that it was not "below an objective standard of reasonableness," without ever explaining the distinction, or why this was so. JA:835.

Respectfully, Appellant submits that a lawyer's failure to notice that the Government's own discovery proves that a victim was paid, and is not owed the restitution being sought, is as basic as it gets.  It is inconceivable that reasonably competent counsel diligently reviewing this available discovery, which showed that Hyatt Arlington "got paid," would fail to object to that hotel receiving

50

restitution for losses not incurred.  On multiple occasions, including in writing,

Wilkins had complained his alleged loss amounts were not accurate.  Miles

acknowledged that Wilkins had asked him to authenticate the losses and interview

witnesses.  Yet no investigators were ever asked to speak to *anyone*, other than at

the Norfolk jail.  *Cf. United States v. Campbell*, 2004 U.S. Dist. LEXIS 30260, at

*45 (D.D.C. 2004) ("Failure to interview potential witnesses in the entirety is not a

strategic decision … and constitutes a failure to investigate which may give rise to

a claim for ineffective assistance.").

     With respect to that jail inquiry, Wilkins' complaint that the Hotel Aloft had

charged him for days when he was physically incarcerated in Virginia *checked out*

*as accurate*.  At least at that point, instead of ignoring his client's complaints or

calling him a manipulator, counsel should have redoubled his review of the

claimed restitution amounts for accuracy, as his client requested.  Instead, Miles

simply accepted the Government's stated loss amounts uncritically, never

challenging a single penny.  Nor did he ever go through this discovery with

Wilkins hotel-by-hotel.

     The best reading of this record is that Miles simply never focused on the

accuracy of Wilkins' restitution amounts.  He never asked, "Is this really owed?" –

at most, he told Wilkins "*Prove* to me it's *not* owed."  That may be an appropriate

stance for a prosecutor, but not for a defense lawyer with diligence obligations.

The reality is that Miles *did not need his client's help* to realize these problems. The Government's own discovery *spoon-fed* this information to him, verifying, for example, that the Hyatt "got paid," and that the Fairmont's own documents revealed that its losses were only $700. All that this required was a review of those documents with a critical eye, rather than mere cursory review of "every page" in a manner akin to checking off a box.

Reasonably diligent counsel would have raised these items, and if they had been noted, prejudice is obvious, since there seems little doubt the Judgment & Commitment Order's erroneous restitution amounts would have been corrected. At present, however, we have a restitution order that is demonstrably incorrect, with parties now scheduled to be paid sums to which they are not properly entitled. That is not a tolerable state of affairs, and should not persist. Ineffective assistance of counsel is apparent, and in any event Wilkins' case should be remanded to the District Court, with instructions that his restitution order should properly be corrected or modified on remand, pursuant to 18 U.S.C. § 3742, Fed. R. Crim. P. 36, 18 U.S.C. § 3614, or otherwise.

## CONCLUSION

For the foregoing reasons, the District Court's ruling that Wilkins is not entitled to relief under 18 U.S.C. § 2255 should be reversed, and this case should be remanded for further proceedings.

Respectfully submitted,

/s/ Gregory S. Smith
Gregory S. Smith
D.C. Bar. No. 472802
913 East Capitol Street, S.E.
Washington, D.C. 20003
Telephone:  (202) 460-3381
Facsimile:  (866) 809-9113
gregsmithlaw@verizon.net
*Counsel for Appellant Dustin X. Wilkins*
(Appointed by this Court)

# CERTIFICATE OF COMPLIANCE

1.   This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    [ X ] this brief contains [*12,979*] words.

    [    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.   This brief document complies with the typeface and type style requirements because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2016*] in [*14pt Times New Roman*]; *or*

    [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: November 29, 2017            /s/ Gregory S. Smith
                                             *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 29th day of November, 2017, I caused this

Sealed Brief of Appellant and Joint Appendix to be filed electronically with the

Clerk of the Court using the CM/ECF System, which will send notice of such filing

to the following registered CM/ECF users:

> Elizabeth Trosman
> OFFICE OF THE U.S. ATTORNEY
> 555 4th Street, N.W.
> Washington, D.C.  20530
> (202) 252-6829
>
> *Counsel for Appellee*

I further certify that on this 29th day of November, 2017, I caused two

copies of the Brief and one copy of the Joint Appendix to be served, via UPS

Ground Transportation, upon counsel for the Appellee, at the above address.

/s/ Gregory S. Smith
*Counsel for Appellant*